B 104
(Rev. 8/87)

# ADVERSARY PROCEEDING COVER SHEET
(Instructions on Reverse)

ADVERSARY PROCEEDING NUMBER
(Court Use Only)

| PLAINTIFFS | DEFENDANTS |
|---|---|
| DYCOAL, INC., H 1 SYNFUELS, LLC, H 2 SYNFUELS, LLC, H 3 SYNFUELS, LLC, I SYNFUELS, LLC, P SYNFUELS, LLC, NORTHWESTERN SYNFUELS, LLC, H BRIQUETTERS LTD., I BRIQUETTERS, LTD., P BRIQUETTERS, LTD., KI DEVELOPMENT, LLC AS SUCCESSOR TO KOMAR INDUSTRIES, INC., STARTEC ENVIRONMENTAL, INC. AND STARTEC PROCESSING, INC. | INTERNAL REVENUE SERVICE, ARK TECHNOLOGY DESIGN, and HARRISON PROCESSING CORPORATION |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| Michael Kaminski<br>DKW Law Group PC<br>58th Floor, US Steel Tower<br>600 Grant Street<br>Pittsburgh, PA 15219<br>(412) 355-2600<br><br>Joel Helmich, Esquire<br>Meyer Unkovich & Scott<br>1300 Oliver Building<br>Pittsburgh PA 15219<br>(412) 456-2841 | Robert G. Sable<br>McGuireWoods LLP<br>23rd Fl. Dominion Tower<br>625 Liberty Avenue<br>Pittsburgh, PA 15222<br>(412) 667-6000<br><br>A.C. Strip<br>Strip, Hoppers, Leihart, McGrath & Terlecky<br>575 S. Third Street<br>Columbus, OH 43215<br>(614) 228-6345 | |

**PARTY** (Check one box only) _____ 1 U.S. PLAINTIFF     _X_ 2 U.S. DEFENDANT     _____ 3 U.S. NOT A PARTY

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Action to (i) quiet title and determine Plaintiffs' interest in five briquetting facilities, (ii) determine that Debtor is entitled to tax credits for the production of qualified fuels, pursuant to section 505(a) of Bankruptcy Code, and (iii) enforce the Debtor's Plan Confirmation Order against the Internal Revenue Service, pursuant to section 1142(b) of Bankruptcy Code.

## NATURE OF SUIT
(Check the one most appropriate box only.)

| | | |
|---|---|---|
| ___ 454 To Recover Money or Property | ___ 455 To revoke an order of confirmation | ___ 456 To obtain a declaratory judgment |
| _X_ 435 To Determine Validity, Priority, or Extent of a Lien or Other Interest in Property | of a Chap. 11 or Chap. 13 Plan<br>___ 426 To determine the dischargeability of a debt 11 U.S.C. §523 | relating to any of foregoing causes of action |
| ___ 458 To obtain approval for the sale of both the interest of the estate and of a co-owner in property | ___ 434 To obtain an injunction or other equitable relief<br>___ 457 To subordinate any allowed claim | ___ 459 To determine a claim or cause of action removed to a bankruptcy court |
| ___ 424 To object or to revoke a discharge 11 U.S.C. §727 | or interest except where such subordination is provided in a plan | ___ 498 Other (specify) |

| **ORIGIN OF PROCEEDINGS** (Check one box only.) | | | | | |
|---|---|---|---|---|---|
| _X_ 1 Original Proceeding | ___ 2 Removed Proceeding | ___ 4 Reinstated or Reopened | ___ 5 Transferred from another Bankruptcy Court | ___ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 |

| DEMAND | NEAREST THOUSAND $ | OTHER RELIEF SOUGHT | JURY DEMAND |
|---|---|---|---|
| | | | |

## BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES

| NAME OF DEBTOR | BANKRUPTCY CASE NO. |
|---|---|
| Dycoal, Inc. | 99-24594 |

| DISTRICT IN WHICH CASE IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |
|---|---|---|
| Western District of Pennsylvania | Pittsburgh | M. Bruce McCullough |

### RELATED ADVERSARY PROCEEDING (IF ANY)

| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
|---|---|---|
| | | |

| DISTRICT | DIVISIONAL OFFICE | NAME OF JUDGE |
|---|---|---|
| | | |

**FILING FEE**   (Check one box only.)     _X_ FEE ATTACHED     _____ FEE NOT REQUIRED     _____ FEE IS DEFERRED

| DATE | PRINT NAME | SIGNATURE OF ATTORNEY (OR PLAINTIFF) |
|---|---|---|
| February 10, 2005 | David I. Swan | |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **In Re:** | ) | |
| | ) | Bankruptcy No. 99-24594 |
| DYCOAL, INC., | ) | |
| Debtor | ) | |
| | ) | Chapter 11 |
| DYCOAL, INC., H 1 SYNFUELS, LLC, | ) | |
| H 2 SYNFUELS, LLC, H 3 SYNFUELS, | ) | |
| LLC, I SYNFUELS, LLC, P | ) | |
| SYNFUELS, LLC, NORTHWESTERN | ) | |
| SYNFUELS, LLC, H BRIQUETTERS | ) | |
| LTD., I BRIQUETTERS, LTD., P | ) | |
| BRIQUETTERS, LTD., KI | ) | |
| DEVELOPMENT, LLC AS | ) | Adversary No. 05- |
| SUCCESSOR TO KOMAR | ) | |
| INDUSTRIES, INC., STARTEC | ) | |
| ENERGY, INC. and STARTEC | ) | |
| PROCESSING, LLC. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| INTERNAL REVENUE SERVICE, | ) | |
| ARK TECHNOLOGY DESIGN, | ) | |
| and HARRISON PROCESSING | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## COMPLAINT, PURSUANT TO SECTION 505(a) OF THE BANKRUPTCY CODE, TO (I) DETERMINE THAT DEBTOR IS ENTITLED TO SECTION 29 TAX CREDITS, (II) TO REAFFIRM THE COURT'S PLACED IN SERVICE FINDINGS AND ENFORCE PLAN CONFIRMATION ORDER AGAINST THE INTERNAL REVENUE SERVICE, <u>AND (III) TO CONFIRM THE SALE OF ASSETS IN CONNECTION THEREWITH</u>

AND NOW, comes Dycoal, Inc. ("Debtor") by and through its undersigned attorneys,

Michael Kaminski and DKW Law Group, and H 1 Synfuels, LLC ("H 1 Synfuels"), H 2

Synfuels, LLC ("H 2 Synfuels"), H 3 Synfuels, LLC ("H 3 Synfuels"), I Synfuels, LLC ("I

Synfuels"), P Synfuels, LLC ("P Synfuels"), and Northwestern Synfuels, LLC ("Northwestern"),

by and through their undersigned attorneys, Robert G. Sable and McGuireWoods LLP, H Briquetters, Ltd., P Briquetters, Ltd., KI Development, LLC ("KI Development"), as successor to Komar Industries, Inc., by and through their undersigned attorneys, Joel Helmrich and Meyer, Unkovic and Scott, LLP, and I Briquetter, Ltd., Startec Energy, Inc. ("Startec Energy") and Startec Processing, LLC ("Startec Processing"), by and through their undersigned attorneys A. C. Strip, John W. Hoppers and Strip, Hoppers, Leithart, McGrath & Terlecky Co., LPA, and file the following Complaint, pursuant to Section 505(a) of the Bankruptcy Code, to (i) Determine that Debtor is entitled to Section 29 Tax Credits, (ii) to Reaffirm the Court's Placed in Service Findings and Enforce Plan Confirmation Order against the Internal Revenue Service (the "IRS"), and (iii) to confirm the Sale of Assets in connection therewith.

## NATURE OF THIS ACTION

1.     This adversary proceeding seeks to quiet title and determine the Plaintiffs' interest in five briquetting facilities (the "Briquetters") and that, pursuant to Section 505 of Title 11, United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), the Debtor is entitled to certain tax credits pursuant to Section 29 of the Internal Revenue Code, 26 U.S.C. § 29, for the production and sale of "qualified fuels" (within the meaning of Section 29(c)) ("Qualified Fuels").

2.     For the owners of synthetic fuel facilities, to monetize the tax credits with respect to synthetic fuel produced by those facilities, the following two (2) conditions are necessary: first, the owner or monetizer of such a facility must obtain a private letter ruling ("PLR") from the IRS that addresses certain structural matters and the status of the production from the facility as Qualified Fuels within the meaning of Section 29(c) and (f), 26 U.S.C. § 29(c) and (f); second, such owner or monetizer must have a reasonable certainty that the facility has been placed in

2

service in satisfaction of the requirements of Section 29(f) and (g).  In the instant case, in the

Order dated June 2, 2000 (the "Plan Confirmation Order") confirming the Debtor's Amended

Plan of Reorganization dated April 6, 2000 (the "Plan"), this Court made all of the necessary

factual findings related to the placed in service facts of the Debtor's five (5) solid synthetic fuel

facilities.  However, after reviewing the Plan Confirmation Order, the IRS has refused to accept

this Court's findings, stating in particular that the placed in service findings are within its own

purview.  Therefore, the Plaintiffs request that this Court reaffirm its factual findings set forth in

the Plan Confirmation Order which are necessary to determine, pursuant to Section 505 of the

Bankruptcy Code, that the Section 29 tax credits claimed by the Debtors were appropriate, and

enforce the Plan Confirmation Order against the Defendant, IRS pursuant to Section 1142(b) of

the Bankruptcy Code, which will allow certain transfers of property contemplated by the Plan to

occur and enable the Plan to be substantially consummated.  The Plaintiffs also request this

Court to grant certain other relief as more fully set forth below.

## JURISDICTION AND VENUE

3.      On June 16, 1999, the Debtor commenced its reorganization case, by filing in this

Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

4.      The Debtor is a corporation organized in 1998 specifically to own and operate the

Briquetters for the production of synthetic fuel from coal.  The Debtor operated five Briquetters

at the Three Rivers Marine and Rail Terminal (the "Three Rivers Terminal") in Belle Vernon,

Pennsylvania.  The findings of fact made by this Court in its Plan Confirmation Order relating to

the Section 29 placed in service criteria of the Briquetters that are set forth at paragraphs 5-6 of

the Plan Confirmation Order ("Placed in Service Findings") and the resultant implications for the

tax credits earned, pursuant to Section 29 of the Internal Revenue Code, by former and future

production of synthetic fuel from two of the Briquetters retained by the Debtor and the three

Briquetters transferred to the Debtor's secured creditors in satisfaction of their secured claims,

formed the basis of the Debtor's Plan.

5.      On April 6, 2000, the Debtor filed the Plan and on June 2, 2000, this Court held

an evidentiary hearing, to determine the feasibility of the Debtor's Plan (the "Confirmation

Hearing").   This Court made the detailed and specific Placed in Service Findings in the Plan

Confirmation Order regarding the construction, installation, and placement in service facts of the

Briquetters, thereby establishing the necessary factual predicates to determine that synthetic fuel

that was and would be produced from the Briquetters would be "qualified fuels" within the

meaning of Section 29(c)(1)(C) of the Internal Revenue Code and thus qualify for the Section 29

tax credits.  See Plan Confirmation Order (Docket #124), ¶¶ 5-6.

6.      The Debtor made proper service of the Plan, the Disclosure Statement filed in

conjunction with the Plan, and the Order scheduling the Confirmation Hearing, pursuant to

Federal Rule of Bankruptcy Procedure 7004(b)(5), on the IRS in Pittsburgh, Pennsylvania and

Washington, D.C., the United States Attorney for the Western District of Pennsylvania and

Attorney General of the United States in Washington, D.C.  Neither the IRS nor the United

States objected to the confirmation of the Plan, or appeared at the Confirmation Hearing.

7.      In reliance upon the Plan Confirmation Order, and the Placed in Service Findings

therein, the Plaintiffs in this adversary proceeding, and/or their predecessors, acquired legal or

equitable title in and to the Briquetters.  The IRS has refused to recognize this Court's Placed in

Service Findings relating to the Briquetters.  In particular, in a PLR issued to I Synfuels, the IRS

has stated, "The determination of the date on which a particular facility was placed in service is a

highly factual matter that is within the purview of the examination function of the IRS."  This

reservation of rights to re-determine the Placed in Service Findings and the placed in service facts relating to the Briquetters is in blatant disregard of the Plan Confirmation Order, which made all necessary findings of fact to determine that the Briquetters were placed in service by the Debtor on or before June 30, 1998. See Plan Confirmation Order, ¶ 5(aa).

8.     The uncertainty of whether the Briquetters were placed in service prior to June 30, 1998, as this Court determined, and whether the IRS is bound by that determination, pursuant to Section 505 of the Bankruptcy Code, principles of claim preclusion, issue preclusion, or otherwise, is an impediment to the purposes and intent of the Plan, and the Plaintiffs therefore request that this Court either determine the Debtor's entitlement to the Section 29 tax credits, pursuant to 11 U.S.C § 505, or reaffirm its Placed in Service Findings and enforce the Plan Confirmation Order against the IRS, pursuant to 11 U.S.C. § 1142(b).

9.     Since the Plan Confirmation Order was entered, this bankruptcy case has remained open while the Plaintiffs have attempted to convince various major institutional investors and the IRS to accept the Court's Placed in Service Findings as binding.  During this time, major institutional investors and insurance companies (including Morgan Stanley, which has issued a written expression of intent, and Chubb Specialty Insurance, which has issued a written indication of coverage) have agreed to monetize or insure the Briquetters and/or provide tax indemnity insurance, but did not monetize or insure the Briquetters due to, among other reasons, IRS moratoriums on issuing Section 29 private letter rulings and refusal to accept this Court's Placed in Service Findings.  Other institutional investors, such as GE Capital, refused to consider monetizing the Briquetters due to the uncertainty over the placed in service facts relating to the Briquetters and whether the Placed in Service Findings are binding on the IRS. Most recently, Ditka LLC and Payton LLC, two affiliates (the "Investors") of Deutsche Bank, a

5

large, international publicly traded financial institution, have agreed to monetize the I Briquetter and have acquired rights to purchase and monetize the other four Briquetters, but the relief sought in this adversary proceeding is necessary for the Investors (i) to produce synthetic fuel from the I Briquetter beyond the amount of production covered by hedge that the Investors structured to minimize the consequences of a successful challenge to the availability of tax credits from such production and (ii) to close on the transaction for the other four Briquetters..

10.     3R Real Estate, formerly known as Fairview, Inc. ("Fairview") is the parent company of the Debtor. Fairview stands to benefit from the Plan Confirmation Order in that after the creditors of the Debtor are paid in full, distributions will be available to pay the obligations of the Debtor to Fairview. See Disclosure Statement (Docket #97), Section V.

11.     In the intervening time between the Plan Confirmation Order and the filing of this Complaint, the Federal Trade Commission (the "FTC") filed a Complaint in Equity and obtained an ex parte temporary retraining order and, subsequently, a preliminary injunction against, among others, 3R Real Estate, and its subsidiaries, i.e., the Debtor. The FTC's Complaint has alleged that 3R Real Estate and other of its affiliates defrauded certain consumers. As a result of the FTC Complaint, the court imposed an asset freeze upon all of the assets of 3R Real Estate and its subsidiary companies, including the Debtor.

12.     The amount that Dycoal is required to pay to Fairview pursuant to the Plan, and the stream of payments that Dycoal expects to receive from the monetization of the H 1 Briquetter, H 3 Briquetter, and I Briquetter, are the only assets of the defendants in the FTC action.

13.     If this Court grants the relief requested by Plaintiffs in this Complaint, then it will (i) lead to the payment of substantial sums of money that the Debtor owes to its parent, Fairview,

and (ii) will enable the Debtor to receive a stream of payments from the monetization of the H 1 Briquetter, H 3 Briquetter, and I Briquetter, which will in turn result in a direct and substantial benefit to the Debtor's estate.    Additionally, if this Court grants the relief requested by the Plaintiffs of the Complaint, it will have the added benefit of directly and substantially benefiting the consumers who have been defrauded by the Debtor, its parent and affiliates, thereby furthering the purposes of the FTC which is an agency of the United States Government.

14.    This court has jurisdiction of this matter pursuant to Sections 157 and 1334 of Title 28 of the United States Code, in that (a) a judicial determination that the Plan was substantially consummated is necessary to remove a cloud on the title of the Briquetters; (b) reaffirmation of the Placed in Service Findings set forth in the Plan Confirmation Order will entitle the Debtor, pursuant to 11 U.S.C. §§ 514(a) and 505(a), to claim the tax credit as an asset of the estate and will directly result in a substantial benefit to the Debtor's estate by enhancing the value of the Briquetters, and therefore, increasing distributions under the Plan in this case; and (c) it is appropriate to enforce the Plan Confirmation Order against the IRS and for the benefit of the Debtor and its Plan of Reorganization, pursuant to 11 U.S.C. § 1142(b) and pursuant to Article XIII of the Plan, in which this Court retained jurisdiction to, *inter alia,* "enter any Order … necessary to enforce the title, rights, and powers of the Debtor."

15.    Venue is proper in this court pursuant to Section 1409 of Title 28 of the United States Code.

16.    This is a core proceeding within the meaning of Section 157(b) of Title 28 of the United States Code.

## THE PARTIES

### Plaintiffs

17.    Dycoal, Inc., the Debtor in these bankruptcy proceedings, is a corporation.

18.    Northwestern Synfuels LLC is a limited liability company organized under the laws of Delaware, which was formed to purchase the H 1 and H 3 Briquetters from the Debtor.

19.    H 1 Synfuels, LLC is a limited liability company organized under the laws of Delaware, which was formed to accept a contribution of the H 1 Briquetter from Northwestern.

20.    H 3 Synfuels, LLC is a limited liability company organized under the laws of Delaware, which was formed to accept a contribution of the H 3 Briquetter from Northwestern.

21.    H Briquetters, Ltd. is a foreign corporation organized under the laws of Nevada, which was formed by Defendants Komar and Startec Processing to take title to the Debtor's H 2 Briquetter pursuant to the Plan.

22.    I Briquetters, Ltd. is a foreign corporation organized under the laws of Nevada, which was formed by Defendants Komar Industries, Inc. and Startec Processing to take title to the Debtor's I Briquetter pursuant to the Plan.

23.    P Briquetters, Ltd. is a foreign corporation organized under the laws of Nevada, which was formed by Defendants Komar Industries, Inc. and Startec Processing to take title to the Debtor's P Briquetter pursuant to the Plan.

24.    H 2 Synfuels, LLC is a limited liability company organized under the laws of Delaware, which was formed to purchase the H 2 Briquetter from H Briquetters, Ltd.

25.    I Synfuels, LLC is a limited liability company organized under the laws of Delaware, which was formed to purchase, and has purchased, the I Briquetter from I Briquetters, Ltd.

26.    P Synfuels, LLC is a limited liability company organized under the laws of Delaware, which was formed to purchase the P Briquetter from P Briquetters, Ltd.

27.    KI Development, as successor to Komar Industries, Inc. ("Komar") is a limited liability company and is a secured creditor in these bankruptcy proceedings.

28.    Startec Energy (formerly known as Startec Environmental, Inc.), is a corporation and is a secured creditor in these bankruptcy proceedings.    Startec Energy is affiliated with Startec Processing.

**The Defendants**

29.    The IRS is an agency of the United States of America.

30.    ARK Technology Design is a corporation and is a secured creditor in these bankruptcy proceedings.

31.    Harrison Processing Corporation ("Harrison") is a corporation and is a secured creditor in these bankruptcy proceedings.

## BACKGROUND OF THE DEBTOR'S FIVE BRIQUETTERS

32.    On December 31, 1996, Harrison entered into a valid and binding enforceable agreement for Turnkey Engineering Procurement, and Construction Services ("Harrison EPC") with Startec Energy, pursuant to which Startec Energy agreed to furnish all services, supervision, testing, labor, materials, supplies, equipment and machinery necessary to supply, construct and install three Briquetters for the production of synthetic fuel from coal ("Harrison Briquetters"). The Harrison Briquetters are designated as the H 1 Briquetter, the H 2 Briquetter and the H 3 Briquetter.

33.    On December 31, 1996, Pelco 21 Ltd., a limited liability company duly organized and validly existing under the laws of the State of Ohio, entered into a valid, binding and

9

enforceable agreement for Turnkey Engineering, Procurement and Construction Services ("Pelco 21 EPC") with Startec, pursuant to which Startec Energy agreed to furnish all services, supervision, testing, labor, materials, supplies, equipment and machinery necessary to supply, construct and install one Briquetter for the production of synthetic fuel from coal ("P Briquetter").

34.    On December 31, 1996, Carl Demmler entered into a valid, binding and enforceable agreement for Turnkey Engineering Procurement and Construction Services ("ICCHC EPC") with Startec, pursuant to which Startec Energy agreed to furnish all services, supervision, testing, labor, materials, supplies, equipment and machinery necessary to supply, construct and install one Briquetter for the production of synthetic fuel from coal ("I Briquetter"). For consideration, Demmler subsequently assigned the ICCHC EPC to I.C.C.H.C., Inc.

35.    The H 1 Briquetter, the H 2 Briquetter the H 3 Briquetter, the I Briquetter and the P Briquetter were all intended to produce solid synthetic fuel from coal feedstock that would qualify as "qualified fuels" within the meaning of Section 29(c)(1)(C) and (f) of the Internal Revenue Code.

36.    On or about June 10, 1998, for consideration, Harrison assigned the Harrison EPC to the Debtor pursuant to a valid, binding and enforceable Assignment and Assumption Agreement.

37.    In June of 1998, also for consideration, the Pelco 21 EPC and the ICCHC EPC were assigned to the Debtor pursuant to valid and enforceable Assignment and Assumption Agreements.

38.     In June of 1998, the Debtor entered into a valid lease of property ("Three Rivers Terminal Lease") for a portion of the Three Rivers Terminals located in Belle Vernon, Pennsylvania where the Debtor intended to operate the H 1 Briquetter, H 2 Briquetter, H 3 Briquetter, I Briquetter and P Briquetter for the production of solid synthetic fuel from coal feedstock.

39.     Pursuant to the terms of the Three Rivers Terminal Lease, inter alia, the Debtor secured the right to transship coal feedstock and ship synthetic fuel produced at the Three Rivers Terminal Lease site by the Harrison Briquetters, the P Briquetter and the I Briquetter.

40.     During the Spring of 1998, the Debtor made arrangements with an unrelated third party who agreed to provide feedstock for long-term operation of the Debtor's Briquetters at the Three Rivers Terminal. Concurrently, the Debtor, through its agents, also made arrangements with an unrelated third party to purchase synthetic fuel produced by the Briquetters at the Three Rivers Terminal. The Debtor ensured that it had authority to operate the Briquetters at the Three Rivers Terminal under the permits issued by the state regulatory agency to the owner of the Three Rivers Terminal.

41.     Also, in the Spring of 1998, the Debtor prepared a business plan applicable to the operation of its Briquetters in accordance with generally accepted business practices which indicated that the Debtor had a viable business plan to operate the Briquetters for the production of solid synthetic fuel at the Three Rivers Terminal.

42.     From on or about June 10, 1998 through June 30, 1998, Startec Energy provided engineering, oversight and construction services to the Debtor and sold, delivered and installed at the Debtor's Three Rivers Terminal Lease site, the five Startec star 30 synthetic fuel Briquetters

constructed pursuant to the Harrison EPC, the Pelco 21 EPC, and the ICCHC EPC, i.e., the Harrison Briquetters, the P Briquetter and the I Briquetter.

43.    The Harrison Briquetters, the P Briquetter and the I Briquetter were built by Startec Energy and its agents and subcontractors according to the plans and specifications contained in the Harrison EPC, the Pelco 21 EPC, and the ICCHC EPC.

44.    All permits and licenses necessary to operate the Harrison Briquetters, the P Briquetter and the I Briquetter had been approved before July 1, 1998, and received by the Debtor before July 1, 1998.

45.    After test production and prior to July 1, 1998, all of the parties responsible for installing, testing, "shaking down" and rendering the five synfuel Briquetters operational, concurred that no significant downtime or equipment related problems occurred and the Debtor's five Briquetters were fully operational and in compliance with their respective Harrison EPC, ICCHC EPC and Pelco 21 EPC.  All parties present agreed and certified that the five Briquetters performed as required, and both the Debtor and Startec Energy executed the appropriate Completion and Acceptance Certificates.

46.    On June 29 and 30, 1998, the Debtor accepted all five synthetic fuel facilities, including each of the five Startec star 30 Briquetters and took possession and control thereof.

47.    Operations of each of the Harrison Briquetters, the P Briquetter and the I Briquetter for their intended purpose, i.e., the production of synthetic fuel, began before July 1, 1998.

48.    Each of the Harrison Briquetters, the P Briquetter and the I Briquetter were in a state of readiness, and available for service for their intended purpose before July 1, 1998.

49.    Synthetic fuel produced by each of the Harrison Briquetters, the P Briquetter and the I Briquetter before July 1, 1998 differed significantly in chemical composition, as opposed to physical composition, from the coal feedstock used to produce it.

50.    The synthetic fuel produced by each of the Briquetters was sold to an unrelated party.

51.    In July of 1998, Dycoal resumed business activities in furtherance of its business plan to produce synthetic fuel from its Briquetters at the Three Rivers Terminal.    During the summer of 1998, Dycoal affixed site-specific conveyor systems and a binder tank to permanently anchor the Briquetters' components to its leased space at the Three Rivers Terminal.   The Debtor also incurred other expenses in the ordinary course of business relating to continued operation of the Briquetters.    In May of 1999, the Debtor produced additional synthetic fuel which it ultimately sold to an unrelated third party.

## SECTION 29 TAX CREDITS

52.    Pursuant to Section 29(a) of the Internal Revenue Code, 26 U.S.C. § 29(a), there shall be allowed as a credit against the tax imposed by the Internal Revenue Code for the taxable year an amount equal to $3.00 multiplied by the barrel of oil equivalent of Qualified Fuels sold by the taxpayer to an unrelated person during the taxable year and the production of which is attributable to the taxpayer.

53.    Pursuant to Section 29(c) of the Internal Revenue Code, 26 U.S.C. § 29(c), the term Qualified Fuels means, inter alia, "liquid, gaseous, or solid synthetic fuels produced from coal (including lignite) including such fuels when used as feedstocks."

13

54.    Pursuant to Section 29(f) of the Internal Revenue Code, 26 U.S.C. § 29(f), Section 29 applies only with respect to Qualified Fuels which are produced in a facility placed in service after December 31, 1979 and before January 1, 1993 and which are sold before January 1, 2003.

55.    Pursuant to Section 29(g) of the Internal Revenue Code, 26 U.S.C. § 29(g), a facility for producing Qualified Fuels is to be treated as being placed in service before January 1, 1993 if such facility was placed in service before July 1, 1998 pursuant to a binding written contract in effect before January 1, 1997. In addition, if the facility is originally placed in service on or before December 31, 1992 (or deemed to be placed in service by December 31, 1992 because it was placed in service before July 1, 1998 pursuant to a binding written contract in effect before January 1, 1997), tax credits are available for Qualified Fuels which are sold before January 1, 2008.

56.    Congress added this tax credit to the Internal Revenue Code as part of the Crude Oil Windfall Profits Tax Act of 1980 to encourage the production and sale of alternative fuel from domestic raw materials, including coal.

57.    Tax credits made available through Section 29 of the Internal Revenue Code are therefore extremely valuable to entities such as Fortune Five Hundred companies that have taxable incomes that create tax liabilities at a level where all tax credits generated by the production and sale of Qualified Fuel from a facility, such as the Harrison Briquetters, the P Briquetter and the I Briquetter, can be used as a direct reduction of tax liability.

58.    The manner in which briquetters such as the Harrison Briquetters, the P Briquetter and the I Briquetter are made valuable to an entity that owns such a briquetter, but that does not have sufficient taxable income to make the tax credits useful to such owner, consists of a

complex series of transactions. Reduced to their most essential terms, the manner in which this typically occurs may be summarized as follows:

59.      Title to the briquetter is transferred to an entity such as a limited liability company that has passthrough tax aspects.

60.      Membership interests in the limited liability company are sold to one or more entities with substantial taxable income and which therefore can utilize the tax credits to reduce its tax liability.

61.      As part of the consideration for the purchase of the membership interest in the limited liability company, the purchasing entity agrees to pay a stream of payments to the party that originally owned, directly or indirectly, the briquetter, and that transferred it to the limited liability company.

62.      The purchasers of membership interests in such limited liability companies, commonly referred to as monetizers ("Monetizer"), require two conditions to operate and monetize a Section 29 facility: (i) a PLR issued by the IRS that addresses structure and other aspects of Section 29 Qualified Fuels; and (ii) because PLRs for synthetic fuel facilities do not address placed in service issues, reasonable certainty that a facility has been properly and timely placed in service in accordance with Section 29.

63.      There are only approximately seventy (70) solid synthetic fuel facilities existing today which successfully convert coal feedstock into synthetic fuel and qualify for tax credits under Section 29 of the Internal Revenue Code. Interests in some synthetic fuel facilities are or were owned, directly or indirectly, by entities such as Sempra Energy, General Electric, Progress Energy, Marriott International, Inc., Morgan Stanley, Fannie Mae, DTE Energy, PPL

15

Corporation, Constellation Energy Group, AIG, Bank of New York, Kimberly-Clark, TECO Energy, and General Mills.

64.     As a result of the Placed in Service Findings made by this Court in the Plan, assuming that all other Section 29 requirements are met, synthetic fuel produced by each of the Harrison Briquetters, the P Briquetter and the I Briquetter is qualified fuels within the meaning of Section 29(c)(1)(C) and (f) of the Internal Revenue Code, and the owner of each such Briquetter (or in the case of a limited liability company, each member according to its allocable interest) is entitled to a credit against the tax imposed by the Internal Revenue Code in an amount equal to $3.00 multiplied by the barrel of oil equivalent of the fuel produced by the Briquetter and sold to an unrelated person.

65.     It is estimated that on an annual basis each of the Harrison Briquetters, the P Briquetter and the I Briquetter owned by the Debtor at the time of the filing of its Chapter 11 Petition can produce approximately 3 million to 5 million tons of synthetic fuel per year, or the equivalent of approximately 13 million to 21 million barrels of oil (assuming the coal feedstock had a Btu content of approximately 12,600 Btus per pound), which would generate approximately $83.4 million to $120 million in tax credits on an annual basis.

## THE CHAPTER 11 PROCEEDINGS

66.     As the Court is aware, these Chapter 11 proceedings were commenced when disputes between the Debtor, on the one hand, and Startec Energy and Komar, on the other hand, resulted in Startec Energy and Komar attempting to repossess the Harrison Briquetters, the P Briquetter and the I Briquetter owned by the Debtor at the time of the filing of Debtor's Chapter 11 Petition.

67.    Issues that existed between the Debtor, on the one hand, and Startec Energy and Komar, on the other hand, were highly contentious throughout the course of the Debtor's Chapter 11 proceedings.

68.    Notwithstanding the initial contentious nature of the relationship between the Debtor and Startec Energy and Komar, the parties were able to reach a settlement ("Komar/Startec Settlement") with respect to a division of the five Briquetters owned by the Debtor at the time of the filing of the Debtor's Chapter 11 Petition.

69.    Pursuant to the terms of the Komar/Startec Settlement, inter alia, the parties agreed that title to two of the five Briquetters owned by the Debtor at the time of the Debtor's Chapter 11 Petition would remain with the Debtor and title to the other three Briquetters ("Transferred Briquetter Plants") would be transferred to the designee of Startec/Komar. However, with respect to one of the Briquetters to be transferred to the Startec/Komar designee, the Debtor was to have a fifty percent (50%) economic interest.

70.    The terms of the Komar/Startec Settlement among the Debtor and Startec Energy and Komar were embodied in the Amended Plan of Reorganization filed by the Debtor.

71.    Pursuant to the terms of the Debtor's Amended Plan of Reorganization, although three of the Debtor's Briquetters were to be transferred to the Startec/Komar designee, on or before the Effective Date of the Plan (defined as, inter alia, 180 days from the Confirmation Date), Komar was required to exercise an option to either (i) retain the Transferred Briquetting Plants or (ii) return the Transferred Briquetting Plants to the Debtor in exchange for which Komar would retain its liens on all five of the Briquetters (Harrison Briquetters, the P Briquetter and the I Briquetter) and would have a secured claim in the amount of $4,500,000 to be paid by

the Debtor in four quarterly installments of principal plus interest at the rate of 10% per annum commencing on the first anniversary of the Effective Date.

72.     On June 2, 2000, this Court entered the Plan Confirmation Order.  A copy of the Plan Confirmation Order is attached as Exhibit "A" and incorporated by reference herein.

73.     As more fully set forth in paragraphs 5 and 6 of the Plan Confirmation Order, the Court made specific findings, i.e., the Placed in Service Findings, with respect to each of the Harrison Briquetters, the P Briquetter, and the I Briquetter.  Specifically, in order to fulfill its obligation to conclude that the Plan was feasible, the Court, upon evidence presented at the Confirmation Hearing, determined that the Harrison Briquetters, the P Briquetter and the I Briquetter owned by the Debtor at the time of the filing of its Chapter 11 Petition fulfilled all factual predicates necessary to produce Qualified Fuels pursuant to Section 29(c)(1)(C) and (f) of the Internal Revenue Code.

74.     The determination of the factual predicates necessary for the Harrison Briquetters, the P Briquetter and the I Briquetter to produce Qualified Fuels was necessary because the Plan provided for a one hundred percent payout to creditors (exclusive of Fairview Inc., the Debtor's parent corporation), and in order to fund such a payout it was necessary that the Harrison Briquetters, the P Briquetter and the I Briquetter have the ability to be sold.  Stated otherwise, if the Court had not found the factual predicates necessary for the Briquetters to produce Qualified Fuels, the Plan would not have been confirmed because it would not have satisfied the feasibility requirement of Section 1129 (a)(11) of the Bankruptcy Code.

75.     Komar and Startec Energy did not elect to return the Transferred Briquetting Plants to the Debtor on or before the Effective Date of the Plan.

76.     Komar and Startec's determination not to return the Transferred Briquetting Plants to the Debtor on or before the Effective Date, and the contribution of funds necessary to fund the Plan by the Debtor's parent corporation, Fairview Inc., were based, in large part, on reliance on the enforceability of the Placed in Service Findings set forth in the Plan Confirmation Order relating to the ability of the Harrison Briquetters, the P Briquetter and the I Briquetter to produce Qualified Fuels.

## THE SALES AND CURRENT OWNERSHIP INTERESTS OF THE FIVE BRIQUETTERS

77.     Subsequent to the confirmation of the Debtor's Plan, on July 12, 2002, the Debtor entered into a First Briquetter Purchase Agreement ("First Briquetter Purchase Agreement") with Northwestern pursuant to which, inter alia, the Debtor agreed to sell and Northwestern agreed to purchase the H 1 Briquetter (one of the Harrison Briquetters) retained by the Debtor.

78.     On July 12, 2002, the Debtor also entered into a Second Briquetter Development and Purchase Agreement ("Second Briquetter Purchase Agreement") with Northwestern pursuant to which the Debtor agreed to sell and Northwestern agreed to purchase the H 3 Briquetter (one of the Harrison Briquetters), the second Briquetter to which the Debtor had title.

79.     The Debtor and Northwestern consummated both the First Briquetter Purchase Agreement and the Second Briquetter Purchase Agreement and the Debtor transferred title to both Briquetters to Northwestern.   Subsequently, Northwestern transferred title to the H 1 Briquetter and the H 3 Briquetter to its affiliates, H 1 Synfuels and H 3 Synfuels, respectively.

80.     On October 31, 2002, P Briquetters, Ltd., an entity which had previously been designated by Startec/Komar to take title to the Debtor's P Briquetter, entered into an Asset Purchase Agreement with P Synfuels, an affiliate of Northwestern, pursuant to which, inter alia,

P Briquetters, Ltd., agreed to sell and P Synfuels agreed to purchase, the P Briquetter that had been transferred to P Briquetters, Ltd., pursuant to the Plan.

81.    On October 31, 2002, H Briquetters, Ltd., an entity which had previously been designated by Startec/Komar to take title to the Debtor's H 2 Briquetter (one of the three Harrison Briquetters), entered into an Asset Purchase Agreement with H 2 Synfuels, an affiliate of Northwestern Synfuels, pursuant to which, inter alia, H Briquetters, Ltd., agreed to sell, and H 2 Synfuels agreed to purchase, the H 2 Briquetter transferred to the Startec/Komar designee pursuant to the Debtor's Plan.

82.    On October 31, 2002, I Briquetters, Ltd., an entity which had previously been designated by Startec/Komar to take title to the Debtor's I Briquetter, entered into an Asset Purchase Agreement with I Synfuels, an affiliate of Northwestern, pursuant to which, inter alia, I Briquetters Ltd., agreed to sell, and I Synfuels agreed to purchase, the I Briquetter transferred to the Startec/Komar designee pursuant to the Debtor's Plan.

83.    The October 31, 2002 agreements described in paragraphs 80-82 hereof expired. Subsequently, those expired agreements were replaced with agreements described below.

84.    On January 14, 2005, I Briquetters, Ltd., entered into an Amended and Restated Asset Purchase Agreement with I Synfuels, pursuant to which, inter alia, I Briquetters Ltd., sold and I Synfuels purchased, the I Briquetter.

85.    The membership interests of I Synfuels are now owned by the Investors and Deutsche Bank intends to use the Section 29 tax credits to offset its taxable income.

86.    On January 14, 2005, each of H 2 Synfuels and P Synfuels entered into an Asset Purchase Agreement with H Briquetters, Ltd. and P Briquetters, Ltd., respectively, pursuant to which they have acquired the right to purchase the H 2 Briquetter, and the P Briquetter.

87.     The Investors also have acquired the right, but not the obligation, to own all of the membership interests of H 1 Synfuels, H 2 Synfuels, H 3 Synfuels and P Synfuels.

88.     Each of H Briquetters, Ltd., I Briquetters, Ltd., P. Briquetters, Ltd., Komar and Startec Energy and Startec Processing relied on the Plan Confirmation Order, including findings related to the Placed in Service Findings.

89.     Each of Northwestern, H 1 Synfuels, H 2 Synfuels, H 3 Synfuels, I Synfuels and P Synfuels (together the "Northwestern Entities") relied on the Plan Confirmation Order, including findings related to the Placed in Service Findings.

90.     Subsequent to the time that Northwestern purchased the H 1 Briquetter and H 3 Briquetter from Dycoal in July of 2002, and subsequent to the October 31, 2002 agreements described in paragraphs 80-82 hereof, the Northwestern Entities have been attempting to either sell the H 1 Briquetter, H 2 Briquetter, H 3 Briquetter, P Briquetter and the I Briquetter or sell the membership interests of the limited liability companies that own or have the right to own those Briquetters.

## RECEIVERSHIP OF FAIRVIEW, INC. AND AFFILIATES
## (INCLUDING DYCOAL)

91.     On November 5, 2004, in an action pending at Civil Action Number 04 C 7177 in the United States District Court for the Northern District of Illinois, the Federal Trade Commission ("FTC") filed a Complaint against, inter alia, 3R Real Estate Corporation, formerly known as Fairview Inc., and subsequently moved ex parte for a Temporary Restraining Order with Asset Freeze ("TRO") and the appointment of a Receiver.

92.     On November 17, 2004, the United States District Court for the Northern District of Illinois entered a Temporary Restraining Order with Asset Freeze ("TRO") and appointed

Nancy A. Ross as Receiver for, inter alia, Three R Real Estate Corporation, formerly known as Fairview Inc., and all of its subsidiaries.

93.     On January 6, 2005, the United States District Court for the Northern District of Illinois entered a Stipulated Order for Preliminary Injunction ("Preliminary Injunction Order") that, inter alia, extended the Receivership and asset freeze imposed by the TRO.

94.     3R Real Estate Corporation f/k/a Fairview Inc. is the parent corporation of the Debtor, and owns 100% of the issued and outstanding stock of the Debtor.

95.     Pursuant to Section III.A of the TRO and Section III.A of the Preliminary Injunction Order, 3R Real Estate Corporation f/k/a Fairview Inc., and its officers, agents, directors, servants, employees, sales persons, independent contractors, attorneys, corporations, subsidiaries, affiliates, successors and assigns, and all other persons or entities in active concert or participation with them, whether acting directly or through any trust, corporation, subsidiary, division, or other device were restrained and enjoined from transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, spending, withdrawing, granting a lien or security interest or other interest in, or otherwise disposing of any funds, real or personal property, or other assets, or any interest therein, wherever located.

96.     Pursuant to Section IV.A of the TRO and Section IV.A of the Preliminary Injunction Order, each person, financial institution, or other entity maintaining or having custody or control of any asset of any defendant named in the TRO and Preliminary Injunction  Order (e.g., the Debtor), or that at any time since January 1, 2000, has maintained or had custody of any such asset, and which is provided with a copy of the TRO, or otherwise has actual constructive knowledge of the TRO, is required to hold and retain within its control and prohibit the withdrawal, removal, assignment, transfer, pledge, hypothecation, encumbrance, disbursement,

participation, conversion, sale, liquidation or other disposal of any of the assets or other property held by, or under its control, or on behalf of any Defendant, or in the name of, or for the benefit or the use of any Defendant.

97.    As of the date of the filing of this Complaint, the terms of the TRO remain in effect.

98.    Nancy A. Ross, Receiver for 3R Real Estate f/k/a Fairview Inc., has consented to the filing of this Complaint in order to resolve issues raised as to the Debtor's assets by reason of entry of the TRO.

## EVENTS WHICH HAVE PREVENTED PLAINTIFFS FROM MONETIZING THE BRIQUETTERS AND IMPLEMENTING THE PLAN

99.    Notwithstanding the Placed in Service Findings that this Court made in the Plan Confirmation Order, the former and current owners of the Debtor's five Briquetters have been unable to monetize the Briquetters, except for the monetization of a limited amount of production from the I Briquetter with respect to which I Synfuels was able to structure a hedge to minimize the consequences of a successful challenge to the availability of tax credits from such production.

100.    In October of 2000, the IRS suspended issuance of PLRs for Section 29 solid synthetic fuel facilities although it appears that the IRS had informally initiated that suspension as early as May of 2000. As explained in paragraph 2 and 58 hereof, PLRs are necessary to monetize such facilities because they rule on complicated business structures and other issues related to Qualified Fuels (except placed in service issues). The IRS' suspension of its issuance of PLRs made it practically impossible to monetize solid synthetic fuel facilities, such as the Debtor's five Briquetters, that had not already received a PLR. In April and May of 2001, the IRS issued Revenue Procedures in which it signaled its willingness to resume issuing PLRs.

101.    Beginning in the summer of 2001 through approximately the fall of 2002, Komar, Startec Processing and H Briquetters, I Briquetters and P Briquetters unsuccessfully attempted to monetize their H 2, I and P Briquetters with major institutional investors and/or experienced Section 29 solid synthetic fuel facility owners and operators.   Separately, the Debtor experienced the same lack of success while trying to monetize its H 1 and H  3 Briquetters. Komar, Startec, H Briquetters, I Briquetters and P Briquetters and the Debtor were unsuccessful because, the potential investors and monetizers who evaluated the Briquetters could not be certain that this Court's Placed in Service findings contained in the Plan Confirmation Order would be binding on the IRS in any future dispute about whether the Debtor's Briquetters had met the placed in service criteria.

102.    As explained above, in the summer of 2002, Northwestern acquired the H 1 Briquetter and H 3 Briquetter from Dycoal and in October 2002, H 2 Synfuels, I Synfuels and P Synfuels entered into the first of a series of agreements pursuant to which they acquired the right to purchase the H 2, I and P Briquetters from Startec Processing and Komar's companies, H Briquetters, Ltd., I Briquetters, Ltd., and P Briquetters, Ltd., respectively.   Concurrently, and as a way to overcome the uncertainly over the efficacy of this Court's Placed in Service Findings, Northwestern, Sentinel, H 1 Synfuels, H 2 Synfuels, H 3 Synfuels, I Synfuels and P Synfuels (representing all five of the Debtor's Briquetters), reached agreement with Chubb Specialty Insurance ("Chubb"), whereby Chubb agreed to provide primary coverage of $125 million of tax indemnity insurance to insure against the risk that the IRS would successfully challenge the tax credits generated by operation of the Briquetters and/or that this Court's Placed in Service Findings would not be efficacious.   A Chubb affiliate tentatively agreed to add $125 million of secondary coverage and other insurers, based upon Chubb's lead underwriting, had expressed

24

interest in writing tax indemnity insurance which would have provided a total tax indemnity placed in service insurance package of approximately $500 million. However, as a condition of writing such insurance, for internal claims related procedures, Chubb forbid Northwestern, Sentinel, H 1 Synfuels, H 2 Synfuels, H 3 Synfuels, I Synfuels and P Synfuels, parties to this instant adversary action, from instituting any legal action including, but not limited to, petitioning this Court to reaffirm its Placed in Service Findings such as this adversary action is, in part, intended to do. Concurrently, in September 2002, Northwestern, Sentinel, H 1 Synfuels, H 2 Synfuels, H 3 Synfuels, I Synfuels and P Synfuels had entered into letters of intent with Morgan Stanley to monetize all five Briquetters based on the impending Chubb tax indemnity insurance.

103.    In the fall of 2002, and in anticipation of Chubb's tax indemnity insurance, each of H 1 Synfuels, H 2 Synfuels, H 3 Synfuels, I Synfuels and P Synfuels applied to the IRS for a PLR for their respective Briquetters, i.e., the five Briquetters formerly owned by the Debtor. From approximately September of 2002 through February of 2003, Northwestern, Sentinel, H 1 Synfuels, H 2 Synfuels, H 3 Synfuels, I Synfuels and P Synfuels negotiated the details of the $500 million of tax indemnity insurance with Chubb including the insuring agreement and the representations and warranties to be made by the insureds. During that time, Chubb precluded Northwestern, Sentinel, H 1 Synfuels, H 2 Synfuels, H 3 Synfuels, I Synfuels and P Synfuels from bringing an action before any Court, including this Court, to reaffirm the Placed in Service Findings.

104.    In February 2003, due to change in the senior executive management of Chubb, and just as Northwestern, Sentinel, H 1 Synfuels, H 2 Synfuels, H 3 Synfuels, I Synfuels and P Synfuels were about to finalize the $500 million of tax indemnity insurance and monetize all five

Briquetters with Morgan Stanley, Chubb abruptly exited the tax indemnity insurance business and left Northwestern, Sentinel, H 1 Synfuels, H 2 Synfuels, H 3 Synfuels, I Synfuels and P Synfuels without an avenue to monetize the Debtor's Briquetters. There was not then, and there is not now, a comparable amount of tax indemnity insurance available in the insurance market place.

105.    By April of 2003, Morgan Stanley was prepared to monetize the I Briquetter based on a much smaller amount of tax indemnity insurance (between $20 million and $40 million) that was available from another insurer after Chubb refused to write the $500 million of tax indemnity insurance. Northwestern, Sentinel, H 1 Synfuels, H 2 Synfuels, H 3 Synfuels, I Synfuels and P Synfuels intended to use the funds from the closing of the I Briquetter to support the litigation now before this Court to reaffirm the Placed in Service Findings and remove any clouds on title to the Debtor's five Briquetters.

106.    In June of 2003, the IRS announced yet another moratorium (its fifth) on the issuance of any new PLRs, which moratorium related to questions about chemical change testing efficacy. Once again, IRS' suspension of issuance of PLRs made it practically impossible to monetize solid synthetic fuel facilities, such as the Debtor's five Briquetters, that had not already received a PLR. That moratorium lasted until late October of 2003.

107.    In early November 2003, discussions with the IRS resumed. However, in early December, the IRS informed Northwestern, Sentinel, H 1 Synfuels, H 2 Synfuels, H 3 Synfuels, I Synfuels and P Synfuels that the IRS would not issue PLRs to them unless they first obtained a Determination Letter from the IRS' Examination Division as to placed in service issues relating to their respective facilities. The effect of this decision was to create an IRS "policy" that

applied only to the Debtor's five Briquetters. The IRS' position continued to make it practically impossible to monetize the five Briquetters.

108.    Northwestern, Sentinel, H 1 Synfuels, H 2 Synfuels, H 3 Synfuels, I Synfuels and P Synfuels met with the IRS in January of 2004 about its new policy and ultimately persuaded the IRS to issue the PLRs without first requiring a Determination Letter. Nevertheless, the IRS conditioned its willingness to issue a PLR to H 1 Synfuels, H 2 Synfuels, H 3 Synfuels, I Synfuels and P Synfuels on including (a) standard language explicitly stating that the IRS National Office (which has responsibility for issuing PLRs) does not express an opinion on when the facility was placed in service, (b) special language indicating that the IRS National Office will advise the IRS examination division (which has responsibility for conducting audits of taxpayers, including making place in service determinations, and ensuring the terms of PLRs are being complied with) of certain facts relevant to a placed in service determination for the facility, which facts are the same placed in service facts that are the subject of this Court's Placed in Service Findings in the Plan Confirmation Order. To the best of Plaintiffs' knowledge, this special language has not been included in any previous ruling on any other Section 29 solid synthetic fuel facility and demonstrates that the IRS does not accept the Placed in Service Findings in this Court.

109.    This unique PLR language has put Northwestern, Sentinel, H 1 Synfuels, H 2 Synfuels, H 3 Synfuels, I Synfuels and P Synfuels at a competitive disadvantage with prospective Monetizers. The language, for obvious reasons, is a red flag for any prospective Monetizer and vitiates much of the comfort that would otherwise be derived by the Monetizer from the PLR.

110.    In the spring of 2004, after over two years of enduring (i) the Chubb decision, (ii) three of the five IRS moratoriums on issuing PLRs, (iii) the IRS policy not to issue PLRs to Northwestern, Sentinel, H 1 Synfuels, H 2 Synfuels, H 3 Synfuels, I Synfuels and P Synfuels without a Determination Letter, and the ultimate reversal of that IRS policy conditioned on including special language in the PLRs that would be issued to Northwestern, Sentinel, H 1 Synfuels, H 2 Synfuels, H 3 Synfuels, I Synfuels and P Synfuels, and (iv) the uncertainty about the efficacy of this Court's Placed in Service Findings, Morgan Stanley indicated it would not monetize the Debtor's five facilities.

111.    From June of 2004 until the current time, to support this action, Northwestern, Sentinel, H 1 Synfuels, H 2 Synfuels, H 3 Synfuels, I Synfuels and P Synfuels negotiated with the Investor regarding monetization of a limited amount of production from the I Briquetter with respect to which I Synfuels was able to structure a hedge to minimize the consequences of a successful challenge to the availability of tax credits from such production.

112.    Thus, since the June 2, 2002 Plan Confirmation Order, the Debtors, as well as the other Plaintiffs, have been frustrated by multiple IRS moratoriums, failed deals with potential Monetizers who had directed the Plaintiffs not to pursue the redress that they now seek, and finally, PLRs that contain language demonstrates that the IRS does not accept the Placed in Service Findings of this Court.

113.    To date, including the contract price under the Harrison, I.C.C.H.C. and Pelco 21 EPCs, the Debtor, Startec Processing and/or Startec Energy, Komar, and Sentinel and Northwestern and their affiliates have invested approximately $15,000,000 in contracting and trying to monetize the facilities.

## COUNT I:  DETERMINATION OF PLAINTIFFS' INTEREST IN THE BRIQUETTERS

### Plaintiffs v. Ark Technology Design and
### Harrison Processing Corporation

114.    Paragraphs 1 through 113 are incorporated herein by reference as if fully set forth herein.

115.    Pursuant to Section 541(a) of the Bankruptcy Code, 11 U.S.C. § 541(a), the commencement of a case under Section 301, 302 or 303 of Title 11 creates an estate consisting of all legal and equitable interests of the debtor's property.

116.    At the time of the filing of the Debtor's Chapter 11 Petition, the H 1 Briquetter, the H 2 Briquetter, the H 3 Briquetter, the P Briquetter and the I Briquetter became property of the estate.

117.    Since the H 1 Briquetter, the H 2 Briquetter, the H 3 Briquetter, the P Briquetter and the I Briquetter were property of the Debtor's estate, this Court has jurisdiction to determine the nature of such Briquetters including, inter alia, whether all facts necessary to determine that the Briquetters can produce Qualified Fuels were in existence as of the filing of the Debtor's Chapter 11 Petition.

118.    Pursuant to the terms of the Plan, all creditors were to be paid one hundred percent of the allowed amount of their claims on the Consummation Date.

119.    Pursuant to the terms of the Plan Confirmation Order, property of the Debtor's estate was not to vest in the reorganized Debtor until the Consummation Date.  Thus, the Plan Confirmation Order contemplated that until such time as all creditors, exclusive of Fairview, Inc., were paid in full, the Briquetters would not vest in the reorganized Debtor, and would remain property of the Debtor's estate.

120.    Although the Debtor believes all creditors have been paid 100% of the allowed amount of their claims, there has been no such judicial determination.

121.    Until such time as there is a judicial determination that all creditors have been paid in full, although H 1 Synfuels and H 3 Synfuels believe that the H 1 Briquetter and H 3 Briquetter are free of any cloud on title, potential future Monetizers might raise a question as to whether the two Briquetters retained by the Debtor (i.e., the H 1 Briquetter and H 3 Briquetter) vested in the reorganized Debtor, and whether the reorganized Debtor could transfer the H 1 Briquetter and H 3 Briquetter outside the ordinary course of business without approval from this Court.

122.    In addition, although I Synfuels believes that it owns the I Briquetter free from any cloud on title, and H 2 Synfuels and P Synfuels believe that H Briquetters, Ltd., and P Briquetters, Ltd. own the H 2 Briquetter and the P Briquetter free of any cloud on title, since there has been no judicial determination as to which option was exercised by Startec/Komar with respect to the three Briquetters which were transferred to the Startec/Komar designees pursuant to the terms of the Plan, absent a judicial determination that Startec/Komar elected option (a) (as described in the Plan and Paragraph 67 hereof), potential future Monetizers might raise a question as to whether I Synfuels, LLC, obtained good title to the Briquetter transferred by I Briquetters, Ltd. and whether H 2 Synfuels and P Synfuels would obtain good title to the Briquetters that may be transferred to them by H Briquetters, Ltd. and P Briquetters, Ltd., respectively.

123.    In addition, although the Plan specifically provided that upon Confirmation, title to the transferred briquetting plants and the 25,000 gallon binder storage tank transferred to and vested in Komar/Startec designees free and clear of all claims, liens, encumbrances, charges and

other interests of creditors, equity security holders or any other party, there has been no judicial finding that Startec/Komar or its designee did not elect the option to transfer the title to the three briquetting plants back to the Debtor and have allowed to themselves a secured claim in the amount of $4,500,000.

124.    In addition to the potential clouds on title arising from the lack of a judicial determination that the Plan was substantially consummated, that Startec/Komar exercised the option to retain the transferred Briquetters, and the receivership involving Dycoal, the Northwestern entities' efforts to sell the Briquetters have been hampered by questions as to the nature of the Briquetters at the time they were estate assets, notwithstanding the specific Placed in Service Findings which this Court made in the Plan Confirmation Order.    Stated otherwise, potential purchasers have questioned whether at the time the Briquetters were estate assets they met all factual predicates necessary to produce Qualified Fuels under Section 29 of the Internal Revenue Code.

WHEREFORE, in order to assure potential purchasers that H 1 Synfuels, H 3 Synfuels, I Synfuels, H 2 Briquetters, Ltd. and P. Briquetters, Ltd. have good title to the H 1 Briquetter, the H 2 Briquetter, the H 3 Briquetter, the P Briquetter and the I Briquetter formerly owned by the Debtor, the Plaintiffs request that:

(a)    The Court enter an Order finding that Komar/Startec Processing elected option (a) under the Plan, and that title to the three Startec/Komar Briquetters (i.e., the H 2 Briquetter, the P Briquetter and the I Briquetter) did not re-vest in the Debtor on the Effective Date of the Plan;

(b)    The Court find that the Consummation Date occurred prior to the time that Dycoal transferred title to the two remaining Briquetters (i.e., the H Briquetter and H 3 Briquetter) to Northwestern;

(c)    The Court determine that no Order was necessary for the reorganized Dycoal to transfer title to its two Briquetters (i.e., the H Briquetter and H 3 Briquetter) to Northwestern; and

(d)    The Court determine that such two remaining Briquetters (i.e., the H Briquetter and H 3 Briquetter) were not property of the estate at the time they were transferred to Northwestern Synfuels.

## COUNT II.  DETERMINATION THAT THE BRIQUETTERS COULD PRODUCE QUALIFIED FUEL UNDER SECTION 29 PRIOR TO THE FILING OF THE DEBTOR'S CHAPTER 11 PETITION

### Plaintiffs v. Internal Revenue Service

125.    Paragraphs 1 through 124 are incorporated herein by reference as if fully set forth herein.

126.    On July 16, 1999, the Debtor filed its Schedules and Statement of Financial Affairs.

127.    On Schedule B the Debtor listed an asset consisting of $20,000 in tax credits resulting from the sale of Qualified Fuels produced pre-petition by the Debtor.

128.    In order for the Debtor to be entitled to the tax credits set forth on its Schedules it was necessary for all factual predicates set forth in paragraphs 5 and 6 of the Plan Confirmation Order to exist.

129.    In amended consolidated tax returns, the Debtor claimed a deduction for depreciation of the H 1 Briquetter, the H 2 Briquetter, the H 3 Briquetter, the P Briquetter and

the I Briquetter for periods prior to and subsequent to the filing of the Debtor's Chapter 11
Petition.

130.    In amended consolidated tax returns, the Debtor reported the sale of synthetic fuel
that generated Section 29 tax credits for periods prior to and subsequent to the filing of the
Debtor's Chapter 11 Petition.

131.    In order to be entitled to claim a deduction for depreciation on each of the five
Briquetters, it was necessary that all Placed in Service Findings set forth in paragraphs 5 and 6 of
the Plan Confirmation Order to have been met and have been true.

132.    Pursuant to Section 505(a) of the Bankruptcy Code, 11 U.S.C. § 505(a), the
bankruptcy court may determine the amount or legality of any tax, or any addition to tax,
whether or not paid and whether or not contested before and adjudicated by a judicial or
administrative tribunal of competent jurisdiction.

133.    Pursuant to the authority granted under Section 505(a) of the Bankruptcy Code,
this Court has jurisdiction to determine whether the placed in service criteria that are embodied
within the Placed in Service Findings, which are necessary to entitle the Debtor to claim the tax
credit as an asset and the deduction for depreciation on the H 1 Briquetter, the H 2 Briquetter, the
H 3 Briquetter, the P Briquetter and the I Briquetter were present at the time of the filing of the
Debtor's Chapter 11 Petition.

134.    In the event the Section 29 placed in service criteria that are embodied within the
Placed in Service Findings necessary to entitle the Debtor to the tax credits and depreciation
were in existence at the time the Debtor sold fuel produced by the H 1 Briquetter, the H 2
Briquetter, the H 3 Briquetter, the P Briquetter and the I Briquetter pre-petition, all such placed
in service criteria will be applicable to any subsequent owners of the Briquetters because the

33

placed-in-service determination is specific to the Briquetter rather than the owner of the Briquetter.

135.    Notwithstanding the post-confirmation sales of the H 1 Briquetter, the H 2 Briquetter, the H 3 Briquetter, the P Briquetter and the I Briquetter, the Debtor continues to have an interest in three of the five entities that currently own the Briquetters.

136.    In the event it is determined that all placed in service criteria embodied within the Placed in Service Findings, which are necessary to qualify fuel produced by the H 1 Briquetter, the H 2 Briquetter, the H 3 Briquetter, the P Briquetter and the I Briquetter pre-petition for tax credits under Section 29, then it will enhance the value of the five Briquetters, which will enhance the Debtor's ability to receive income and make distributions to Fairview Inc., the Debtor's sole remaining creditor.

137.    The H 1 Briquetter, the H 2 Briquetter, the H 3 Briquetter, the P Briquetter and the I Briquetter are wasting assets because their ability to produce Qualified Fuels that generate Section 29 tax credits will end when Section 29 expires on December 31, 2007.

138.    Each day that the H 1 Briquetter, the H 2 Briquetter, the H 3 Briquetter, the P Briquetter and the I Briquetter do not produce Qualified Fuels, the ability to produce more than 41,000 tons of Qualified Fuels is irretrievably lost, which production would generate more than $1.1 million worth of tax credits on the sale of such Qualified Fuels.

139.    While the H 1 Briquetter, the H 2 Briquetter, the H 3 Briquetter, the P Briquetter and the I Briquetter do not produce Qualified Fuels, those who would be entitled to earn a stream of payments from the sale of such Briquetters, including the Debtor, irretrievably lose a minimum of approximately $18 million per month, which translates into $216 million per year (assuming that each Briquetter produces at an annual rate of 3 million tons).

WHEREFORE, the Debtor requests that the Court reaffirm its previous Placed in Service Findings embodied in the Plan Confirmation Order and determine, pursuant to Section 505 of the Bankruptcy Code, that at the time of the filing of the Debtor's Chapter 11 petition, the synthetic fuel produced by the H 1 Briquetter, the H 2 Briquetter, the H 3 Briquetter, the P Briquetter and the I Briquetter owned by the Debtor was Qualified Fuels and thus qualified for tax credits under Section 29 of the Internal Revenue Code, and that the tax credits reflected in the Debtor's schedules were properly listed as assets of the estate.

## COUNT III:  ENFORCEMENT OF PLAN CONFIRMATION ORDER AGAINST THE INTERNAL REVENUE SERVICE

### Plaintiffs v. Internal Revenue Service

140.    Paragraphs 1 through 139 are incorporated herein by reference as if fully set forth herein.

141.    As stated in the Schedules filed by the Debtor in these proceedings, the Debtor listed among its assets a $20,000 tax credit to which the Debtor was entitled under Section 29 of the Internal Revenue Code, for Qualified Fuels produced by the H 1 Briquetter, the H 2 Briquetter, the H 3 Briquetter, the P Briquetter and the I Briquetter owned by the Debtor prior to the filing of the Debtor's Chapter 11 Petition.

142.    In addition, in the Amended Disclosure Statement filed by the Debtor, the Debtor listed among the Debtor's assets the $20,000 tax credit to which the Debtor was entitled due to Qualified Fuels produced by the Debtor's Briquetters prior to the filing of the Debtor's Chapter 11 Petition.

143.    The Amended Disclosure Statement discloses that in order for the Debtor's Amended Plan to be feasible, it was necessary that the Debtor's Briquetters be able to produce synthetic fuels that qualify as Qualified Fuels and thus generate tax credits under Section 29 of

35

the Internal Revenue Code. Accordingly, the Debtor's Amended Disclosure Statement disclosed that at the Confirmation Hearing, the Debtor would request the Court to make findings as to all factual predicates necessary for the Debtor's Briquetters to produce Qualified Fuels under Section 29 of the Internal Revenue Code.

144.    Pursuant to Federal Rule of Bankruptcy Procedure 7004(b)(5), service on an agency of the United States is to be made by first class mail on the United States Attorney for the district in which the action is brought, the Attorney General of the United States at Washington, D.C., and the agency sought to be joined.

145.    A copy of the Debtor's Amended Plan, the Amended Disclosure Statement, and the Order scheduling the Confirmation Hearing was served on the IRS in Pittsburgh, Pennsylvania and Washington, D.C., the United States Attorney for the Western District of Pennsylvania and the Attorney General of the United States in Washington, D.C.

146.    Notwithstanding the fact that service was made on the IRS as prescribed by Federal Rule of Bankruptcy Procedure 7004(b)(5), and notwithstanding the fact that the Disclosure Statement specifically disclosed the factual findings which the Debtor would request as to the qualification of fuels produced by the Debtor's Briquetters under Section 29 of the Internal Revenue Code, neither the United States nor the IRS objected to the confirmation of the Debtor's Plan or the factual findings the Debtor was requesting.

147.    Notwithstanding the fact that there were no objections to the confirmation of the Debtor's Plan, the Court had an independent duty to make a determination that all elements of 11 U.S.C. § 1129(a) were present prior to confirming the Plan.

148.    At the Confirmation Hearing, in order to meet the requirements of 11 U.S.C. § 1129(a)(11), the Debtor, Startec Energy and Komar presented evidence in the nature of

documents and affidavits establishing each factual predicate necessary for finding that synthetic fuel produced by the Debtor's Briquetters qualify for tax credits under Section 29 of the Internal Revenue Code.

149.    Based on evidence presented at the Confirmation Hearing, this Court made the Placed in Service Findings set forth in the Plan Confirmation Order.

150.    Pursuant to Section 1142(b) of the Bankruptcy Code, 11 U.S.C. § 1142(b), the court may direct any necessary party to perform any act that is necessary for the consummation of a plan.

151.    Notwithstanding the fact that this Court has made detailed findings based on evidence introduced at the Confirmation Hearing, that the Debtor's Briquetters meet all factual predicates necessary to produce Qualified Fuels under Section 29 of the Internal Revenue Code, and notwithstanding that the IRS was a party in interest in these Chapter 11 proceedings due to the pre-petition tax credits claimed by the Debtor, and that the IRS was served with a copy of the Amended Plan, the Amended Disclosure Statement and the Order scheduling the Confirmation Hearing, potential Monetizers of the Briquetters have been reluctant to monetize the Briquetters due to the questions as to whether the Plan Confirmation Order and Placed in Service Findings contained therein are enforceable against the IRS.

152.    In order to provide certainty to potential Monetizers, it is necessary that an Order be entered enforcing the Confirmation Order against the IRS.

WHEREFORE, the Debtor requests that this Court enter an Order enforcing the Confirmation Order against the IRS.

Respectfully submitted,

/s/ Michael Kaminski
Michael Kaminski
DKW Law Group PC
58th Floor, US Steel Tower
600 Grant Street
Pittsburgh, PA 15219
Telephone: (412) 355-2600
Facsimile: (412) 355-2609

Attorneys for Dycoal, Inc.

/s/ Robert G. Sable
Robert G. Sable
David I. Swan
McGuireWoods LLP
23rd Floor, Dominion Tower
Pittsburgh, PA 15222
Telephone: (412) 667-6000
Facsimile: (412) 667-6050

Attorneys for Northwestern Synfuels, LLC, H 1 Synfuels, LLC, H 2 Synfuels, LLC, the H 3 Synfuels, LLC, I Synfuels, LLC and P Synfuels, LLC

/s/ Joel M. Helmrich
Joel M. Helmrich
Meyer, Unkovic & Scott
1300 Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222
Telephone: (412) 456-2841
Facsimile: (412) 456-2864

Attorneys for H. Briquetters, Ltd., P Briquetters, Ltd., and KI Development as Successor to Komar Industries, Inc.

/s/ A. C. Strip
A. C. Strip
John Hoppers
Strip, Hoppers, Leithart, McGrath & Terlecky Co., LPA
575 S. Third Street
Columbus, OH 43215
Telephone: (614) 228-6345
Facsimile: (614) 228-6369

Attorneys for I Briquetter, Ltd., Startec Energy, Inc. and Startec Processing, LLC